Filed 3/11/25  P. v. Chagoya CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALEJANDRO ELIUTH CHAGOYA,<br><br>    Defendant and Appellant. | F087422<br><br>(Super. Ct. No. BF183138A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Kathy Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant and appellant Alejandro Eliuth Chagoya was convicted of robbery and five counts of assault with a firearm on a peace officer.  Chagoya contends:  (1) the trial court erred by not excluding testimony that, while in custody awaiting trial, Chagoya told a deputy sheriff he had tried to kill multiple police officers and was not afraid to kill a

sheriff; (2) the court erred by refusing his request to instruct the jury on the untimely disclosure of evidence of his statement while in custody; (3) the court erred by not excluding expert toolmark testimony not supported by the material relied on by the expert; and (4) the cumulative effect of the errors prejudiced him.

We affirm.

## PROCEDURAL SUMMARY

On February 21, 2023, the Kern County District Attorney filed an amended information charging Chagoya with:  kidnapping in the course of a carjacking (Pen. Code,[1] § 209.5, subd. (a); count 1); carjacking (§ 215, subd. (a); count 2); robbery of a car or other personal property (§ 212.5, subd. (c); count 3); five counts of attempted murder of a peace officer (§ 217.1, subd. (b); counts 4, 6, 8, 10 and 12); and five counts of assault with a firearm on a peace officer (§ 245, subd. (d)(1); counts 5, 7, 9, 11 and 13).  The information alleged enhancements for personal use of a firearm (§ 12022.53, subd. (b)) on counts 1, 2 and 3, and personal and intentional discharge of a firearm (§ 12022.53, subd. (c)) on counts 4 through 13.

On March 6, 2023, the jury found Chagoya guilty on counts 3, 5, 7, 9, 11, and 13, but acquitted him on counts 1, 2, 4, 6, 8, 10, and 12.  The firearm enhancement was found true on counts 5, 7, 9, 11 and 13, but not true on count 3.

On December 7, 2023, the trial court sentenced Chagoya to 61 years, 8 months consisting of:  on count 5, the middle term of 6 years plus 20 years for the enhancement; on count 3, one-third of the middle term of 1 year to be served consecutively; and one-third of the middle term of 2 years plus 6 years, 8 months for the enhancement each on counts 7, 9, 11 and 13, all to be served consecutively.

Chagoya filed a timely notice of appeal.

---

[1] Undesignated statutory references are to the Penal Code.

## FACTUAL SUMMARY

### A. The Robbery and Assaults

On the evening of November 10, 2020, Leonardo C. was at Planz Park in Bakersfield playing his accordion and drinking.[2] Chagoya and his friend, C.J.,[3] took Leonardo's accordion from him and demanded $250 to return it. C.J. drove Leonardo and Chagoya from the park to Leonardo's home in Leonardo's white Toyota Camry.

Leonardo lived in an apartment on White Lane in Bakersfield with his mother, Maria, his grandmother, and Maria's other child. When Leonardo returned to the apartment from the park, he went upstairs where Maria had just gotten out of the shower. Leonardo looked worried and told Maria, "There's a guy that wants to kill me." Leonardo told Maria the guy was downstairs and had a gun. Maria questioned why this person wanted to kill Leonardo and Leonardo responded, "Because he wants money." Maria asked, "Why does he want money?" Leonardo answered, "Because he took my accordion and he wants money to return my accordion to me." Maria asked Leonardo, "Do you owe him anything?" and Leonardo replied "No." Maria told Leonardo to pay him if Leonardo owed something, but if not, to call the police. Leonardo again denied owing anything and told Maria they wanted $250 for his accordion.

Leonardo used his cell phone to call 911 from his bedroom. Leonardo told the 911 dispatcher there was a guy at his apartment with a gun trying to kill him. Leonardo described Chagoya as Hispanic and wearing a red hoodie and black jeans. Chagoya came upstairs while Leonardo was on the phone. Chagoya was dressed in black, in a hoodie, and had on a red hat with red letters. Chagoya was polite to Maria, and she was not afraid of him. Chagoya told Maria that Leonardo owed $250 to Chagoya's uncle for a

---

[2] Leonardo did not testify at trial because he died in March 2022. Parts of the factual background are taken from the recording of Leonardo's 911 call, which was admitted as evidence.

[3] "C.J." refers to former codefendant, Cedrick Headspeth, Jr.

flat tire.  Chagoya agreed to let Maria get her purse and sweater so she could go to the bank to get money because Leonardo had no money.  Chagoya went back downstairs.  As Maria was coming down the stairs, she heard loud knocking on the apartment's front door with the police announcing their presence and asking to come inside.  Chagoya ran to the back of the apartment and out the back door.

Bakersfield police officers had been dispatched to Leonardo's apartment with an alert that a subject inside the apartment was armed with a firearm.  Officers Ryan Maxwell and Sherrel Cobbins arrived at the apartment building in uniform in a marked patrol car.  Officers Rodolfo Diaz and Andres Rangel arrived in uniform in their own patrol cars at the same time.  The officers approached the apartment with guns drawn.  Chagoya opened the apartment door and immediately shut it after Diaz gave a command like "police, let me see your hands."  From outside, the officers yelled something along the lines of, "Bakersfield Police, open the door."  Diaz kicked the door to force entry.  The door opened as Diaz was kicking it and Leonardo was on his knees inside the entryway.  Leonardo told the officers Chagoya had fled out the back door.  The officers began running on White Lane to find Chagoya.  Diaz and Rangel continued to pursue Chagoya while Maxwell and Cobbins returned to Leonardo's apartment.

Diaz and Rangel saw Chagoya come out of an alley towards them.  Diaz shouted twice, "Show me your hands."  Chagoya turned and ran in the opposite direction down the alley and then ran northbound into a dirt field.  Diaz and Rangel chased after him.  As he pursued Chagoya, Diaz yelled, "Stop.  Bakersfield Police.  Stop."  Rangel also yelled "Police."  Chagoya continued running.

Officers Chad Dickson and Kassandra West[4] responded in a patrol car to assist the officers going to a call for a suspect with a firearm making threats.  While en route, one

---

[4] West's last name was Latham on November 10, 2020, but was subsequently changed to West.  We refer to her throughout as West.

of the units on scene radioed for additional officers to respond. Dickson was driving in an alley near Leonardo's apartment complex when he saw Chagoya being chased by Diaz and Rangel via the car's mirrors. Dickson stopped the car and he and West jumped out to join the pursuit.

Diaz was running in front of Rangel and lost sight of Chagoya while illuminating his flashlight on a dark sedan with a man and a woman in it parked in the dirt field in Chagoya's path. Dickson and West were running behind Diaz and Rangel. The officers heard a single gunshot in the field. Diaz saw a muzzle flash come from the area near Chagoya when he heard the gunshot. Diaz yelled "Shots fired." Rangel radioed shots fired and turned around to run the other way to seek cover in the alley. Diaz believed he was in danger and took cover behind the sedan. The officers heard more gunshots. Diaz and Dickson believed Chagoya fired at them because Chagoya turned back towards them, and more muzzle flashes came from near him. Dickson fired four rounds from his nine-millimeter Glock 17 handgun at Chagoya. Rangel ran back into the field toward the sedan. West ran toward the sedan's passenger side and looked inside. She saw a female inside screaming but no firearms. Diaz yelled to the sedan's occupants to get out of the car.

Officers Keith Schlecht and Brent Thomas were driving close by Leonardo's apartment complex in their patrol car and responded to the request for additional units. Schlecht and Thomas heard over the radio that the suspect was running, and shots had been fired. A description of Chagoya's appearance was given over the radio. Based on the direction Chagoya was reportedly running, Thomas drove their patrol car into the dirt field. Thomas turned the car's spotlight onto the field and began scanning the field to find Chagoya or the other officers. Thomas drove northbound in the field and saw Chagoya running in that direction. Thomas drove after Chagoya with the spotlight on him while Schlecht propped open the door on his side. Schlecht heard gunshots and saw muzzle flashes as Chagoya turned and fired at the officers and the patrol car. Schlecht

never saw the firearm as it was being fired. Thomas also saw a muzzle flash come from near Chagoya.

From the open car door, Schlecht fired his nine-millimeter Glock 17 handgun twice at Chagoya. Thomas stopped the car and got out. Thomas fired approximately six shots from his own nine-millimeter Glock 17 handgun at Chagoya. Chagoya fell facedown onto the ground. He had been shot in his right hand. Schlecht and Thomas yelled at Chagoya to put his hands straight out in front of him and lay flat on the ground. Schlecht searched Chagoya, then Schlecht and West handcuffed him.[5]

## B. Law Enforcement's Investigation

After Chagoya was arrested, Thomas backtracked along Chagoya's path of travel to search for a firearm because there was no firearm near Chagoya. Thomas found a Polymer80 nine-millimeter semiautomatic handgun with an attached extended magazine on the ground about 20 feet from where Chagoya fell. The gun had one Perfecta nine-millimeter round in the chamber with four additional Perfecta rounds and one GFL round in the magazine. The gun had no serial number.

Sergeant Keegan Gavin, the assigned lead detective, conducted a round count[6] of the officers that discharged their firearms. Dickson's firearm was missing four rounds, Thomas's firearm was missing six rounds, and Schlecht's firearm was missing two rounds. Gavin interviewed Diaz, Rangel, West, Maxwell, and Cobbins on November 11, 2020. He also interviewed Dickson, Thomas, and Schlecht on November 18, 2020. Gavin watched the officers' body-worn camera footage. Gavin opined that a puff of dust on the ground directly in front of Diaz shown in his footage was consistent with a bullet striking the ground.

---

[5] The officers' body cameras recorded their encounter at Leonardo's apartment and their pursuit of Chagoya. Footage from the cameras was admitted as evidence.

[6] A round count is an inspection after an officer-involved shooting to count the remaining number of rounds in the officer's firearm(s) and magazine(s).

Gavin and another detective interviewed Chagoya at the police station on November 11, 2020.[7]  Gavin advised Chagoya of his *Miranda*[8] rights.  Chagoya said he was walking home, got scared when he saw the police and ran.  Chagoya's friend, C.J., was running in front of him.  Chagoya told the police he fell to the ground when he heard "Freeze," but C.J. turned around and started shooting.  Chagoya heard gunshots coming from behind him before he got hit.  He initially denied shooting a gun or being in Leonardo's apartment.  He then disclosed that Leonardo came to the park looking for "coke" and lost some of the cocaine.  Chagoya admitted he met with others outside Leonardo's apartment but continued to deny having or shooting a gun.  Chagoya claimed "the main issue" was that Leonardo popped a friend's uncle's tire.  Chagoya told the police that Leonardo asked his mother for the money right in front of Chagoya and they were going to go to the bank with her.  Chagoya did not want to tell Leonardo's mother about the drugs but told her that Leonardo was drinking and driving.  Chagoya claimed someone else pulled out a gun on Leonardo at his apartment.  Chagoya confirmed he was in the car when C.J. drove from the park to Leonardo's apartment.  He later admitted he was inside the apartment but denied having a gun inside the apartment.  He also admitted he had a gun and shot it while running but said he "kept shooting forward."  He claimed he would not shoot to kill and "just shoot[s] to scare."  He said he "just react[s]" when he "freak[s] out."  He admitted he shot first.  He later told Gavin, "maybe yeah I did shoot on purpose.  Maybe I wanted to."

The police conducted a crime scene investigation of the dirt field, the apartment complex block, and Leonardo's apartment.  Twelve nine-millimeter Winchester bullet casings were found.  This matched the duty weapon ammunition used by Bakersfield Police at the time.  The police also found six nine-millimeter Perfecta bullet casings, a

---

[7] Chagoya's interview was recorded, and the recording admitted as evidence.

[8] *Miranda v. Arizona* (1966) 384 U.S. 436.

single nine-millimeter Blazer bullet casing, and a single nine-millimeter Remington (RP) bullet casing. A red hooded sweatshirt inside a black jean jacket was found by a dumpster in the alley near the apartment complex. The police believed Chagoya was wearing this sweatshirt in Leonardo's apartment and discarded it while fleeing.

Elizabeth Menees, a Kern Regional Crime Laboratory forensic technician, conducted three test fires of the recovered Polymer80 handgun. The three test-fire casings and three test-fire bullets were collected for the lab's criminalist, Apryl Brown. Brown examined eight of the spent casings collected from the crime scene and concluded seven of the casings were fired from the same firearm. Brown opined that those seven casings were fired from the Polymer80 handgun recovered by the police, but one casing was fired from a different firearm.[9]

## C. Incident at Lerdo Justice Facility

On July 13, 2021, Chagoya was in custody at the Lerdo Justice Facility (Lerdo). At about 8:00 p.m. that day, three inmates including Chagoya were in the facility's dayroom and refused Senior Deputy Bullock's order to lock down. In response to the order, Chagoya said "or" while standing outside his second tier cell above Bullock and two other deputies, Roman Samano and Diego Magana. Chagoya saying "or" was understood to be a challenge to Bullock's authority. Chagoya said to Bullock, "I will slap your bitch ass." Chagoya's cellmate had come out of the shower and heard Chagoya. The cellmate ran upstairs and convinced Chagoya to return to their cell.

After Chagoya returned to his cell, Bullock asked Sergeant Luevanos that Chagoya be rehoused. Luevanos ordered Samano and Magana to take Chagoya to a holding cell. Samano and Magana escorted him in handcuffs. Bullock joined the deputies as they were escorting Chagoya. Chagoya told Samano and Magana that he was a respectful person and did not mean to be disrespectful to them. Bullock asked Chagoya

---

[9] Brown's testimony is discussed in more detail in the discussion section below.

why he was disrespectful to Bullock. Chagoya responded that he tried to kill multiple BPD[10] officers and he was not afraid to kill a sheriff. Chagoya was walking in the hallway when he made this statement. After he said this, he was placed in the holding cell. Samano and Magana wrote and submitted incident reports documenting what occurred. Chagoya was rehoused because of his threats to Bullock.

Lerdo had cameras that record video and audio in the dayroom and the hallway next to the dayroom. Samano and Magana were unaware if there was video of the incident although cameras record the areas where it occurred. Neither deputy tried to watch video of the incident. No one asked either deputy to look at or provide the video.

## DISCUSSION

### I. Chagoya's Statement at Lerdo

### A. Additional Background

On February 9, 2023,[11] Chagoya filed motions in limine requesting, in relevant part, the prosecutor to disclose and provide all photographs, witness statements, potentially exculpatory evidence, and items of physical evidence in advance of opening statements pursuant to *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

A hearing addressing motions in limine was held on February 21. The prosecutor indicated his intent to introduce evidence of Chagoya's statement about killing officers at Lerdo. The prosecutor stated that reports about the incident had been provided to defense counsel. The trial court granted defense counsel's request for an Evidence Code section 402[12] hearing (402 hearing) on this evidence.

---

[10] BPD stands for Bakersfield Police Department.

[11] Subsequent references to dates are to dates in 2023 unless otherwise stated.

[12] Evidence Code section 402, subdivision (b) provides in pertinent part that the "court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury."

The 402 hearing initially proceeded on February 23. Samano testified about the Lerdo incident on July 13, 2021, including about Chagoya's statement to Bullock that he tried to kill multiple Bakersfield police officers and was not afraid to kill a sheriff. Samano was not wearing a body-worn camera at the time and denied the incident was recorded. Samano wrote a report documenting the incident during his shift that day. On cross-examination, Samano confirmed there were cameras that record both video and audio in Lerdo's dayroom. Samano was unaware if anyone had requested footage of the incident or how long footage was stored. After Samano's testimony, the hearing was not completed and was continued at a later date.

On February 27, Chagoya filed a motion to dismiss the amended information, or in the alternative, for a mistrial or other sanctions. He argued the prosecutor had failed to disclose any audio or video recording of the Lerdo incident although Samano testified at the 402 hearing that there are cameras in the dayroom. Chagoya argued the prosecutor's failure to provide this evidence violated his rights to due process and to confront witnesses, and further violated his motion in limine for disclosure of *Brady* evidence.

The trial court held a hearing on Chagoya's motion to dismiss the day it was filed. The prosecutor submitted a memo stating that after the 402 hearing on February 23, the prosecutor asked his senior investigator to obtain the video footage from Lerdo. The investigator knew Lerdo's standard retention period for footage is 13 months. The investigator tried to obtain the footage from Lerdo and was told the video no longer existed. The prosecutor had provided Chagoya with the incident reports on February 28, 2022. The prosecutor conceded he was aware of incident reports at Lerdo discussing video recording of incidents, but said he was unaware there may be video of the incident involving Chagoya until the 402 hearing. Defense counsel requested a dismissal of the charges, a mistrial or exclusion of the evidence as a remedy. The court was not inclined to dismiss the charges or declare a mistrial because the jury had not heard this evidence yet, but remained undecided about what to do with the evidence. The prosecutor took the

10.

position there was no discovery violation. Defense counsel responded that the prosecutor had a duty to provide discovery to the defense and the evidence should be excluded. The court proceeded with the 402 hearing before determining how to rule on Chagoya's motion.

Magana then testified substantially similarly to Samano about the incident on July 13, 2021, with the additional detail that Chagoya's cellmate convinced him to return to his cell. Magana also wrote a report documenting the incident toward the end of his shift. Magana confirmed there was a camera that recorded video and audio in the area where Chagoya made this statement to Bullock, but Magana was unaware if there was video of the incident.

After further argument from both parties, the trial court denied Chagoya's motion to dismiss the amended information or order a mistrial. The court also denied his request to exclude the evidence because the evidence was relevant to his state of mind, the record was unclear if there had in fact been video or audio recording of the incident, and both deputies would be subject to cross-examination.

On March 1, the trial court noted the majority of jury instructions had been discussed and agreed upon. Defense counsel noted the court had indicated its intention to deny Chagoya's request to instruct the jury with CALCRIM No. 306 on the untimely disclosure of evidence related to the deputies' testimony about the Lerdo incident. Counsel would however be given wide leeway to argue the issue about the video to the jury. The prosecutor objected to giving CALCRIM No. 306 because the deputies' incident reports were timely disclosed to Chagoya, defense counsel was able to cross-examine the deputies about the failure to obtain the footage, and counsel could argue the issue to the jury. The court noted the incident reports had been given to Chagoya more than a year ago, the witnesses testified to that, and the footage had been discussed at length earlier. The jury was not given CALCRIM No. 306.

11.

In closing argument, the prosecutor argued Chagoya's statement at Lerdo that he tried to kill multiple police officers conflicted with his claim in his police interview that he did not shoot at the police. The prosecutor pointed to Chagoya's statement as evidence that he intended to kill the officers when he shot at them. The prosecutor argued the jury could not speculate about whether there was video evidence of the incident and must base its decision on the evidence in the record, specifically, the deputies' testimony about what happened.

In her closing argument, defense counsel questioned why only Samano and Magana testified about the Lerdo incident although there were other people present including the person Chagoya supposedly threatened, Bullock. Counsel argued there were cameras everywhere, but no video of the incident and she wanted that video and wanted the jury to see that video. She questioned why there was no video of Chagoya's "so-called admission of intent." Counsel averred that Chagoya's statement either did not happen or did not happen in the way the witnesses testified because there was no video evidence submitted of his statement.

## B. Admission of the Deputies' Testimony

Chagoya contends the trial court abused its discretion by not excluding the deputies' testimony about the Lerdo incident. He argues the court should have excluded the deputies' testimony because the prosecutor's discovery violation was willful and the prejudice to him was substantial.

Section 1054 et seq. (the reciprocal discovery statute) "governs the scope and process of criminal discovery." (*People v. Tillis* (1998) 18 Cal.4th 284, 289.) Section 1054.1 requires the prosecutor to disclose to a defendant certain "materials and information," including "[r]elevant written or recorded statements of witnesses[.]"

12.

(§ 1054.1, subds. (b)–(c), (e)–(f).)[13] "The information named [in section 1054.1] must be disclosed only 'if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies.' (§ 1054.1.) Case law has interpreted this requirement to encompass not only information actually possessed but that ' "within the possession or control" of the prosecution' or put another way, ' "reasonably accessible" to it.' " (*People v. Superior Court* (*Dominguez*) (2018) 28 Cal.App.5th 223, 234 (*Dominguez*).) " 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 280; § 1054.7.)

The trial court has broad discretion to determine whether a party violated the discovery statute and whether to impose sanctions for any such violation. (*People v. Ayala* (2000) 23 Cal.4th 225, 299 (*Ayala*).) "When a party fails to comply with the statutory disclosure requirements, the trial court 'may make any order necessary' to enforce those provisions, including, but not limited to, '[initiating] contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continu[ing] the matter, or any other lawful order.' " (*People v. Hughes* (2020) 50 Cal.App.5th 257, 281, quoting § 1054.5, subd. (b).) "The court may prohibit the testimony of a witness pursuant to [section 1054.5] subdivision (b) only if all other sanctions have been exhausted." (§ 1054.5, subd. (c).) The "exclusion of testimony is not an appropriate remedy absent a showing of significant prejudice and willful conduct motivated by a desire to obtain a tactical advantage at trial." (*People v. Jordan* (2003) 108 Cal.App.4th 349, 358; accord *People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1758.)

---

[13] For purposes of section 1054.1, the "witness's words, whether recorded electronically or by someone's writing them down, *are* the statement." (*Thompson v. Superior Court* (1997) 53 Cal.App.4th 480, 486.)

We review the trial court's ruling on an alleged discovery violation for abuse of discretion. (*Ayala*, *supra*, 23 Cal.4th at p. 299.) We "will not disturb [the court's] ruling unless there is a showing the court abused [its] discretion by acting in an arbitrary, capricious, or patently absurd manner resulting in a miscarriage of justice." (*People v. Fayed* (2020) 9 Cal.5th 147, 189–190.)[14]

Here, the record does not show the prosecutor willfully failed to disclose the video footage to obtain a tactical advantage. The record remains unclear if the facility's cameras in fact captured Chagoya's interaction with Bullock. While the facility had cameras in the relevant area, neither deputy investigated whether those cameras recorded the exchange. The prosecutor candidly disclosed he was aware of incident reports from Lerdo discussing video recordings. But the deputies' reports regarding the incident involving Chagoya did not indicate there may be video and the prosecutor represented to the court he was unaware there may be video until the 402 hearing. Upon learning there may be video during that hearing, the prosecutor asked his investigator to find out if the incident was recorded and if so, whether the video still existed. By then, any video that previously existed was no longer in the facility's possession because Lerdo only retained video for 13 months. We reject Chagoya's argument the prosecutor's claim he had no duty to obtain the footage shows he willfully failed to comply with his discovery obligations. The "prosecution has no *general duty* to seek out, obtain, and disclose all evidence that might be beneficial to the defense." (*In re Littlefield* (1993) 5 Cal.4th 122, 135.) The record reflects the prosecutor intended to present evidence of Chagoya's statement solely through the deputies' testimony and did not consider or investigate if

---

[14] "Independent of our criminal discovery statutory scheme, the federal constitution imposes a duty of disclosure on the prosecution" of exculpatory evidence pursuant to *Brady*, *supra*, and its progeny. (*Dominguez, supra*, 28 Cal.App.5th at p. 234.) Chagoya's claim rests entirely on state law and does not implicate his constitutional rights under *Brady*. The sole issue before us is thus whether the trial court abused its discretion under state law.

there was video of the incident until the 402 hearing. Nothing in the record supports Chagoya's speculative assertions the video probably contained impeachment evidence. Any video recording of the incident may just as likely have bolstered the deputies' testimony.

To prevail on a claim for violation of the discovery statute, Chagoya must show prejudice under the *Watson* standard applicable to state law error, i.e., by showing it is reasonably probable he would have received a more favorable outcome absent the violation. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 470; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Chagoya focuses predominantly on the prosecutor's closing argument to contend it is reasonably probable a result more favorable to him would have resulted had the trial court excluded the deputies' testimony. Chagoya argues the prosecutor's emphasis on the importance of his statement at Lerdo mandates this court treat the significance of this evidence as similarly crucial. We are not persuaded. Notwithstanding the prosecutor's arguments to the jury that Chagoya's statement at Lerdo evinced his intent to kill the police officers, the jury acquitted him on all five counts of attempted murder. The jury however convicted him on the five counts of assault with a firearm on a peace officer. Unlike criminal attempt, the "crime of assault has always focused on the nature of the act and not on the perpetrator's specific intent." (*People v. Chance* (2008) 44 Cal.4th 1164, 1170 (*Chance*).) Accordingly, while attempted murder requires the defendant has the specific intent to kill (*People v. Canizales* (2019) 7 Cal.5th 591, 602), assault is a general intent crime that "does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur." (*People v. Williams* (2001) 26 Cal.4th 779, 790 (*Williams*).) Because assault does not require showing Chagoya intended to kill or even injure the police officers, his statement to Bullock was immaterial to his guilt for assault. Moreover, even had the trial court excluded the deputies' testimony, compelling evidence supported Chagoya's guilt for the assault convictions. Diaz, Dickson, and Schlecht all testified

15.

Chagoya turned and shot in the direction of the officers and the patrol car while he was fleeing.[15] There were visible muzzle flashes from Chagoya's location and Diaz's body-worn camera captured a puff of dust on the ground directly in front of Diaz indicating Chagoya shot in the officers' direction.

Additionally, the trial court took measures to reduce the potential prejudice to Chagoya for the lack of video footage by giving defense counsel wide leeway to argue the issue before the jury. Counsel took full advantage of this latitude in closing argument by emphasizing the lack of video evidence of the interaction, questioning the reliability of the deputies' testimony, and pointing to the failure of the threat's target, Bullock, to testify. Given the jury's verdict, these arguments were presumably persuasive.

In sum, the record did not support the extreme remedy of excluding the deputies' testimony about Chagoya's statement while in custody at Lerdo. Because there is no reasonable probability of a different outcome if the evidence had been excluded, Chagoya has not shown prejudice from admission of the deputies' testimony.

## C.     CALCRIM No. 306

Chagoya argues the trial court erred by refusing his request to instruct the jury on the untimely disclosure of evidence using CALCRIM No. 306. He claims this error prejudiced him and requires reversal of his convictions.

The trial court has the discretion to advise the jury of the untimely disclosure of evidence. Section 1054.5, subdivision (b) states the court "may advise the jury of any failure or refusal to disclose and of any untimely disclosure." CALCRIM No. 306 provides: "Both the People and the defense must disclose their evidence to the other side

---

[15] The offense of assault with a firearm on a peace officer requires the additional element that the defendant "knows or reasonably should know that the victim is a peace officer." (§ 245, subd. (d)(1).) Diaz and Rangel identified themselves as police before Chagoya shot at the officers. Schlecht and Thomas pursued Chagoya in a marked patrol vehicle and all the officers who pursued him were in uniform.

before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the (People/defense) failed to disclose: *<describe evidence that was not disclosed>* [within the legal time period]. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure." The Bench Notes to CALCRIM No. 306 state in relevant part that the "court should not give this instruction unless there is evidence of a prejudicial violation of the discovery statute." (Judicial Council of Cal., Criminal Jury Instns. (2024) at p. 82.)

Here, the trial court reasonably could have concluded the record was inconclusive as to whether the prosecutor violated the discovery statute. The prosecutor timely provided Chagoya with the deputies' incident reports. The court apparently found that the prosecutor's failure to obtain video of the Lerdo incident was inadvertent. We will not second guess the court's credibility determination on appeal. The court reasonably declined Chagoya's request to instruct the jury with CALCRIM No. 306 where there was insufficient evidence the prosecution violated the discovery statute.

Even if it was error not to give CALCRIM No. 306, the error was harmless. In determining whether the failure to instruct requires reversal, we again apply the *Watson* standard to determine " 'whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 679.)

Here, it is not reasonably probable Chagoya would have received a more favorable result had the jury been given CALCRIM No. 306. The instruction would merely have informed the jury that the prosecution failed to provide Chagoya with video of the Lerdo incident. The jury effectively already knew this information from the testimony of Samano and Magana that they did not try to obtain and were not asked to provide video of Chagoya's exchange with Bullock. Chagoya inaccurately asserts the failure to provide

17.

the instruction prevented defense counsel from arguing about the late discovery. On the contrary, counsel specifically argued to the jury about the failure to produce video footage of the incident despite "cameras everywhere" in Lerdo and invited the jury to reject the deputies' testimony due to the lack of video footage.

The circumstances in *People v. Zamora* (1980) 28 Cal.3d 88, on which Chagoya relies, are inapposite. In that case, the prosecution had destroyed records of citizen complaints against police officers about two weeks before the defendant's arrest. (*Id.* at pp. 94–95.) The destroyed records were critical given the case came down to a credibility contest between the police officers and the defendant. The Supreme Court found the trial court prejudicially erred by failing to impose the sanction of a jury instruction with an adverse finding against the prosecution because the records' destruction deprived the defendant of the opportunity to discover favorable evidence about the officers' past use of force. (*Id.* at pp. 103–104.) Unlike in *Zamora*, the destruction of any video footage from Lerdo appears inadvertent rather than willful and the lack of footage caused minimal prejudice to Chagoya given he was able to cross-examine the deputies about the incident. As discussed above, the trial court gave defense counsel wide leeway to argue the issue to the jury and the verdict indicates those arguments were effective. Even if it was error for the court to refuse Chagoya's request to instruct the jury with CALCRIM No. 306, the error was harmless.

## II.   Expert Toolmark Testimony

Chagoya argues the trial court erred by not excluding expert toolmark testimony not supported by the material relied on by the expert. Chagoya contends matching bullets to guns is subjective and lacks established quantitative standards. He argues the court must act as a gatekeeper to exclude speculative expert testimony and admission of the toolmark evidence prejudiced him.

18.

## A. Additional Background

### 1. *Motion in Limine*

Chagoya moved in limine to exclude testimony and any other evidence about toolmark analysis as inadmissible pursuant to *Kelly-Frye*.[16] On February 14, the trial court held a 402 hearing to address whether the prosecution's toolmark evidence should be admitted. At the hearing, defense counsel augmented the basis for the exclusion request as supported by Evidence Code sections 801 and 802, *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*), and *People v. Azcona* (2020) 58 Cal.App.5th 504 (*Azcona*). The prosecution argued the toolmark analysis that would be presented was not a new or novel science based on *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*) and *Azcona*.

The criminalist, Apryl Brown, testified during the 402 hearing. Brown has been a criminalist for more than 17 years. She concluded the group of bullet casings recovered at the scene were fired from the Polymer80 handgun recovered by the police and test-fired by the laboratory. Brown confirmed there are three possible categories of markings for casings: class, subclass, and individual characteristics. Subclass characteristics can be imparted during the manufacturing process and leave gross marks across an entire production run of weapons. Brown confirmed there was no reference file for subclass characteristics for any particular weapon. If a weapon has something unique about it and produces a particular mark on a casing, that is an individual characteristic.

Brown testified that she assesses whether a marking that is not a class characteristic has the potential for subclass. This assessment is made based on research material and training that assist in determining whether a marking is subclass. Brown confirmed there was no way for an analyst to confirm his or her opinion on whether a

---

[16] *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.

marking is individual or subclass beyond training, experience, classes, and articles. There have been no organized studies on subclass marks associated with different firearms or different subclass marks associated with different manufacturing methods. There has also been no organized study on what types of marks on a casing are individual marks as opposed to subclass marks.

Brown agreed that when comparing a test-fired casing and an evidence casing, there may be a marking on the test-fired casing that is not on the evidence casing. Brown testified she looks at the overall pattern matchings to determine the level of agreement between casings based on her training, but conceded there is no specificity or numerical value that must be met. She confirmed it was possible two analysts could come to different conclusions with one making an identification and another finding the markings inconclusive. The lab has a verification process, but no other analyst looked at the evidence without knowing Brown's conclusions to see if they came to the same conclusions. Brown has never had a blind, independent verification of her work.

There have been two studies generally discussing the accuracy and validity of toolmark examination. One study was specific to Beretta firearm barrels. The Ames study in 2014 looked at cartridge case comparisons and found a false positive rate of 1.01 percent among 218 firearm examiners.

According to Brown's training, no minimum number of points of similarity are needed to call something an identification. When Brown refers to an overall pattern of agreement, she is not talking about any particular number of points of agreement. What Brown considers a lot of agreement may differ from what another analyst considers a lot of agreement. Brown is not required to find any particular minimum number of points of agreement from case to case. The Kern County Criminal Laboratory has no policy there be a certain minimum number of points of agreement.

Brown disagreed there have not been sufficient studies to understand the reliability and repeatability of the methods used in toolmark analysis. In addition to the Beretta and

20.

Ames studies, Brown cited a second Ames study with the FBI in 2022 and the Keisler study. The 2022 Ames study found a false-positive error rate of 0.66 percent for bullets and 0.93 percent for cartridge cases. Brown testified there have been more studies beyond those four but did not specifically name the additional studies.

When Brown writes a report saying she has identified something as fired from a lab item, she expresses no degree of certainty regarding that conclusion. Brown agreed that when she finds there is sufficient agreement to call something an identification, there is no level of certainty associated with that result.

The trial court denied Chagoya's request to exclude the evidence of toolmark analysis. The court found the evidence was not subject to *Kelly-Frye* because it was not new or novel, was widely used and accepted, and generally accepted in the scientific community. The court concluded the "fact that there's no degree of certainty … does not make it inadmissible," but found that the information brought out by defense counsel was "ripe for cross-examination and bringing up to the jury," which the court would allow counsel to do.

### 2. *Expert Witness Testimony at Trial*

At trial, Brown testified as an expert in the field of firearm analysis and toolmark analysis. For this case, Brown received eight spent nine-millimeter casings (one Blazer, six Perfecta and one Remington or RP), the recovered Polymer80 nine-millimeter firearm, and a spent bullet projectile. Brown did a preliminary examination of the eight casings under the stereo microscope to document class characteristics and different features of each cartridge case. She then looked at each cartridge case amongst each other by doing a microscopic comparison. Based on her analysis, Brown determined there were two firearms involved in firing the eight casings. She concluded seven of the casings were fired by one firearm, but the Remington casing was fired by a different firearm.

21.

Brown took photographs with the comparison microscope showing the eight spent casings (items 001.A through 008.A). The Blazer brand casing was item 001.A, the Remington brand[17] casing was item 007.A, and the other items were the Perfecta casings (items 002.A through 006.A and 008.A). Based on her training and experience, Brown compared item 003.A to the rest of the spent casings because it had "good marks" to work with in her comparison. In comparing item 003.A with item 005.A, there was a double angled mark on one, but not the other. Brown testified there can be variation from firing to firing so "sometimes marks will reproduce on one that won't be present on the other." Brown still concluded the two casings were fired from the same firearm. She based her opinion on the overall comparisons and the other areas of agreement she saw. Brown does not document every single point of agreement or disagreement she finds, just enough for the technical review and visual that can be shown in court. Brown found that all the spent casings except the Remington casing had an elliptical-shaped firing pin impression.

Brown examined the three test-fired casings and three test-fired bullets from the Polymer80 firearm. Based on her examination under the comparison microscope, the firearm was leaving reproducible marks that could be compared with item 003.A. After comparing the test-fired casings to item 003.A, Brown concluded the seven evidence casings that had been fired from the same firearm were all fired from the Polymer80. Brown also examined the bullet projectile recovered as evidence and opined it was inconclusive whether it was fired from the Polymer80.

---

[17] Chagoya inaccurately states the criminalist did not test any Remington spent casings. Because he made this statement in discussing the officers' use of their guns, we infer he intended to state Brown did not test any of the Winchester spent casings. These casings were presumed to be from the officers' guns as the type of ammunition used by Bakersfield Police at the time.

## B. Applicable Law

Even where proffered expert testimony does not require a *Kelly*[18] analysis, the trial court "has the duty to act as a 'gatekeeper' to exclude speculative expert testimony" under Evidence Code sections 801 and 802.[19] (*Sargon*, *supra*, 55 Cal.4th at p. 753.) Under Evidence Code section 801, the trial court in its gatekeeping role may "exclude speculative or irrelevant expert opinion." (*Sargon*, at p. 770.) Evidence Code section 802 furthers that gatekeeping role and "indicates the court may inquire into the expert's reasons for an opinion. It expressly permits the court to examine experts concerning the matter on which they base their opinion before admitting their testimony." (*Sargon*, at p. 771.) Under Evidence Code section 802, "a court may inquire into, not only the type of material on which an expert relies, but also whether that material actually

---

[18] The "*Kelly* rule provides that the 'admissibility of expert testimony based on a "new scientific technique" requires proof of its reliability—i.e., that the technique is " 'sufficiently established to have gained general acceptance in the particular field to which it belongs.' " ' " (*Cowan*, *supra*, 50 Cal.4th at p. 469.) "*Kelly* applies only to ' "that limited class of expert testimony which is based, in whole or in part, on a technique, process, or theory which is *new* to science and, even more so, to the law." ' " (*Id.* at p. 470.)

[19] Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

Evidence Code section 802 provides: "A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based."

supports the expert's reasoning. 'A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.' " (*Sargon*, at p. 771.) "Thus, under Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or 3) speculative." (*Sargon*, at pp. 771–772.)

"The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Sargon*, *supra*, 55 Cal.4th at p. 772.)

We review a trial court's ruling to exclude or admit expert testimony for abuse of discretion. (*Sargon*, *supra*, 55 Cal.4th at p. 773.) A trial court abuses its discretion when its ruling "is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

## C. Analysis

Chagoya contends the trial court erred in considering his objection to the toolmark evidence because Brown's testimony confirmed she used subjective methods and there were no fixed guidelines for matching a casing to a particular gun.

Chagoya analogizes this case to *Azcona*. In *Azcona*, the prosecution's expert witness testified that he compared a bullet casing found at one crime scene with a casing found at another crime scene and concluded the two casings were fired from the same gun. The expert explained that he needed to see six individual marks in a row to meet his identification criteria. He opined the casings from the two crime scenes were fired from the same gun " 'to the practical exclusion of all other guns.' " (*Azcona*, *supra*, 58 Cal.App.5th at p. 510.) At a hearing on the defendant's in limine motion, the

24.

defendant presented evidence criticizing visual analysis of firearm toolmarks as unreliable. (*Id.* at p. 512.) The *Azcona* court concluded the defendant presented "legitimate criticism from credible sources" undermining the reliability of visual toolmark comparison as a scientific method but fell short of showing "that firearm toolmark comparison testimony is no longer admissible in California." (*Id.* at pp. 512–513.) The Court of Appeal nonetheless concluded the trial court erred by "allowing unfettered expert testimony that went far beyond what the underlying material supported." (*Id.* at p. 513.) Specifically, the trial court erroneously allowed the expert to present his opinion "in language suggesting scientific certainty" (*id.* at p. 512) by giving "a purportedly infallible conclusion" that was unsupported by the material the expert relied upon (*id.* at p. 514).

The expert testimony in this case is readily distinguishable from the testimony deemed objectionable in *Azcona*. Unlike the expert in *Azcona*, Brown conceded there was no level of certainty associated with her finding a sufficient level of agreement between casings to make an identification. Brown confirmed that when she reaches a conclusion about an identification, she expresses no degree of certainty as to that conclusion. She also testified there was no specificity or numerical value that must be met for her to find agreement between casings. Specifically, there are no minimum number of points of similarity needed for Brown to make an identification.

Chagoya does not argue Brown's testimony was inadmissible under *Kelly*, but instead claims the trial court was obligated by its gatekeeping role to consider whether the evidence was inadmissible as based on "subjective and non-quantitative methods, unfettered by consistent evidence-based standards." We need not determine if the court erred by admitting Brown's expert testimony because we conclude any error was harmless under the applicable *Watson* standard. (*People v. Prieto* (2003) 30 Cal.4th 226, 247 [erroneous admission of expert evidence is state law error subject to *Watson* standard].)

Chagoya claims that without the ballistics testimony, there would have been a reasonable chance one or more jurors would have rejected the theory that he acted willfully and with realization of probable harm when he shot the gun in the field, and instead credited his statement to police that he just "freaked out" and reacted. We disagree. Preliminarily, Chagoya made conflicting statements to police about his intent because he initially claimed he shot "to scare" and "not to kill," but later said, "maybe [he] did shoot on purpose." This is also not a case where Chagoya's conviction depended on tying him to the crime scene by connecting bullet casings with a particular firearm. Brown's testimony matching the spent casings to the Polymer80 firearm was not dispositive evidence of Chagoya's guilt. As previously discussed, no specific intent to cause injury is required for assault, but rather, the "focus is on the 'offensive or dangerous character of the defendant's conduct.' " (*People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 207.) For Chagoya to be guilty of assault, he must have intentionally performed an act with "actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Williams*, *supra*, 26 Cal.4th at p. 790; § 240 ["assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another"].) Even excluding Brown's testimony, three officers testified Chagoya turned and shot in their direction after at least two officers had identified themselves as police. No plausible argument can be made that shooting a gun at a person does not satisfy the general intent requirement for assault. If a defendant aiming a gun away from a pursuing police officer *without* firing the gun suffices for the actus reus of assault, then certainly firing a gun at multiple officers is more than sufficient. (E.g., *Chance*, *supra*, 44 Cal.4th at pp. 1173–1176 [sufficient evidence supported § 245, subd. (d)(1) conviction where the fleeing defendant aimed his gun in the opposite direction of the pursuing officer but did not fire the gun]; see also *People v. Raviart* (2001) 93 Cal.App.4th 258, 264–267 [substantial evidence supported assault with a

deadly weapon on two peace officers where the defendant only managed to point the gun at one officer before the officers shot the defendant].)[20]  Therefore, even assuming error in the admission of Brown's testimony, it is not reasonably probable Chagoya would have received a more favorable verdict in the absence of the ballistics testimony.

## III.    Cumulative Error

Lastly, we reject Chagoya's claim of cumulative error because there are no errors to accumulate.  We have determined there was no error in admitting the deputies' testimony or refusing to instruct the jury with CALCRIM No. 306, and concluded any error in admitting Brown's testimony was not prejudicial.  Therefore, "there was no prejudicial error to accumulate." (*People v. Hensley* (2014) 59 Cal.4th 788, 818.)

---

[20] Chagoya also argues the location of the spent casings was likely used by the jury to find guilt on the assault counts as evidence of a realization that his act would directly and probably result in the application of force to a person.  He does not adequately explain this speculative assertion or how the location of the casings evinced his understanding of the dangerousness of his conduct.  In the absence of cogent legal argument, we need not and do not address this assertion. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [a general assertion unsupported by specific argument permits the court to treat the claim as waived].)  We further reject as meritless Chagoya's last claim that prosecutorial argument based on inadmissible evidence is clear indicia of prejudice.  Because Brown's testimony *was* admitted into evidence, it was permissible for the prosecutor to argue her testimony's relevance to the jury.

## DISPOSITION

The judgment is affirmed.

FAIN, J.*

WE CONCUR:

HILL, P. J.

FRANSON, J.

---

*Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.